UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLO9RIDA

CASE NO. <u>11-20587-CR-SCOLA</u>

UNITED STATES OF AMERICA

vs.

JAMES WYNN,
a/k/a Riley Wynn,

        **Defendant.**
_____/

<u>**AGREED FACTUAL BASIS FOR GUILTY PLEA**</u>

<u>**Biscayne Milieu Scheme:**</u>

      Beginning in approximately February 2009, and continuing through approximately September 2011, the defendant, JAMES WYNN, a/k/a Riley Wynn, knowingly and willfully conspired and agreed with others to pay and receive illegal health care kickbacks in violation of 18 U.S.C. § 371.

      In approximately February 2009, WYNN became a patient broker who provided patients to Biscayne Milieu Health Center, Inc. ("Biscayne Milieu") in exchange for kickbacks. Another patient recruiter for Biscayne Milieu, James Edwards, introduced WYNN to Jorge Macli, the manager of Biscayne Milieu, in 2009. WYNN first met Jorge Macli in a parking lot, where they scheduled a meeting. At this scheduled meeting, WYNN told Jorge Macli that he was recruiting patients for another PHP called American Therapeutic Corporation ("ATC"), and that he was receiving $30.00 per patient. WYNN also told Jorge Macli that he could recruit patients from Maryland. Jorge Macli agreed to pay WYNN $30.00 per patient that he brought to Biscayne Milieu for each day that patient attended the program. Subsequently, Jorge Macli met with WYNN, and the other "Case Managers" individually, to discuss putting the "Case Managers" on a regular "salary" to further conceal the kickback arrangements. According to WYNN, Jorge Macli based the "salary" on the "Case Managers'" average earnings for the previous six-month period. Despite the fact that WYNN's compensation was now called a "salary," and appeared to be a flat rate, WYNN's payments were still based upon the number of patients he recruited for Biscayne Milieu's PHP.

      In order to conceal the kickback payments to WYNN, Jorge Macli directed WYNN to break-down his kickback monies into an hourly salary at $50.00 per hour, so that it would appear that what Biscayne Milieu paid him was an hourly salary for case management services provided. Jorge Macli did this for all of the "Case Managers" as they were all, in reality, patient recruiters. WYNN did as instructed, and created these fake invoices to conceal the kickback

1

payments. Jorge Macli gave WYNN sample invoices and instructed WYNN on how to write the fake invoices in a way that justified his large salary. WYNN created the fake invoices after he received his kickback check. WYNN would take his paycheck amount received for recruiting patients and divide that amount by $50.00 in order to calculate the amount of hours he allegedly worked. WYNN would then fabricate invoices based upon the amount of hours allegedly worked.

WYNN received his kickback monies in the form of salary checks from Biscayne Milieu. However, in 2010, WYNN created a company called "Good Orderly Directions," and Jorge Macli would issue some of the kickback checks to WYNN through this company. According to WYNN, Jorge Macli would deduct approximately 10 percent of his kickback monies if the check was made out to him personally, but would make no such deduction if the check was made out to Good Orderly Directions. If WYNN had an issue with the amount of his kickback payment, he would either speak to Jorge Macli or Sandra Huarte.

WYNN recruited some of his patients from clinics in Maryland where WYNN himself had been treated. Indeed, WYNN was a former cocaine user, and he would recruit patients by telling them that he himself got "clean" by attending facilities similar to Biscayne Milieu. In the beginning, Jorge Macli paid WYNN approximately $500 to reimburse WYNN for the travel expenses he incurred to get the patients down to South Florida. Later on in the conspiracy, Jorge Macli instructed WYNN that he would have to pay for the transportation of these patients himself, as Jorge Macli was concerned that the kickback payments to the patients for transporting them to Florida would be easily discoverable. WYNN used to utilize Greyhound bus service as the means for transporting the patients down to South Florida, but later began using a discounted airline.

Upon arriving in South Florida, WYNN would place his "clients," which is how the "Case Managers" referred to the recruited patients, in different halfway houses. Some of the houses were run and operated by other "Case Managers" from Biscayne Milieu. The clients understood that they had to attend Biscayne Milieu's PHP or face eviction from their halfway houses.

WYNN often would meet with his "clients" while they were in group therapy sessions at Biscayne Milieu. According to WYNN, he would pull these "clients" out of the therapy sessions, with the permission of the therapists. Biscayne Milieu would nonetheless bill Medicare for the entire group therapy session.

Many of the patients attending Biscayne Milieu did not qualify for PHP treatment as they were not in an acute phase of their mental illness, or they did not suffer from a mental illness at all, but were rather merely alcoholics or drug abusers. WYNN admitted that he would often "coach" his "clients" on what to say so that they would be admitted into the program. Additionally, WYNN had an arrangement with Dr. Gary Kushner to get his patients admitted into Biscayne Milieu. WYNN would contact Dr. Kushner's wife, Diane Kushner, at Dr. Kushner's office, and she would let WYNN know which hospital Dr. Kushner was located at that time. WYNN would then send his "client" to that hospital to be admitted by Dr. Kushner for "detoxification." According to WYNN, he made this arrangement with Dr. Kushner so that his

"clients" would be easily admitted to the hospital and then admitted or readmitted back to Biscayne Milieu with the necessary hospital paperwork. Despite the fact that these "clients" did not qualify for PHP treatment, Dr. Gary Kushner would nonetheless admit them to the hospital and then to Biscayne Milieu for PHP treatment.

Between February 2009 and June 2011, Biscayne Milieu billed Medicare approximately $2,385,060 for the patients recruited by WYNN. As a result of those submissions, Medicare paid Biscayne Milieu approximately $684,327. WYNN knew that Biscayne Milieu would bill Medicare for the inappropriate patients he recruited to attend Biscayne Milieu's PHP.

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charges against me. It does not include all of the facts known to me concerning criminal activity in which I and others engaged. I make this statement knowingly and voluntarily and because I am in fact guilty of the crimes charged.

DATE: 2/8/12

JAMES WYNN
Defendant

DATE: 2/8/12

C. CRAIG STELLA, ESQ.
Attorney for Defendant

DATE: 2/8/12

ALICIA E. SHICK
Assistant United States Attorney

3